IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

UNITED STATES OF AMERICA,          *
THE INTERNAL REVENUE SERVICE,
                                   *
     Plaintiff,
                                   *          CASE NO. 4:09-CV-79 (CDL)
vs.
                                   *
LARRY C. MITCHELL,
                                   *
     Defendant.
                                   *
_____

O R D E R

    The United States ("Government") appeals the bankruptcy court's

finding that Larry C. Mitchell's ("Debtor") federal tax liabilities

for 1998 through 2002 are not excepted from discharge pursuant to

Section 523(a)(1)(C) of the U.S. Bankruptcy Code.  The bankruptcy

court found that Debtor did not willfully evade his income taxes and,

therefore, did not satisfy the 11 U.S.C. § 523(a)(1)(C) exception to

11 U.S.C. § 727(b)'s general discharge of debts in bankruptcy.  For

the following reasons, the Court affirms the bankruptcy court.

STANDARD OF REVIEW

    The district court, in reviewing a decision of a bankruptcy

court, functions as an appellate court.  *See Williams v. EMC Mortgage*

*Corp.* (*In re Williams*), 216 F.3d 1295, 1296 (11th Cir. 2000) (per

curiam); *see also Reider v. Fed. Deposit Ins. Corp.* (*In re Reider*),

31 F.3d 1102, 1104 (11th Cir. 1994).  On an appeal from a bankruptcy

court, district courts "may affirm, modify, or reverse a bankruptcy

judge's judgment, order, or decree or remand with instructions for

further proceedings." Fed. R. Bankr. P. 8013.  The Court must accept the bankruptcy court's findings of fact unless those facts are clearly erroneous.  *Id.*  A finding of fact is clearly erroneous when the record lacks substantial evidence to support it, such that an appellate court's review of the evidence results in a firm conviction that a mistake has been made. *Walden v. Walker* (*In re Walker*), 515 F.3d 1204, 1212 (11th Cir. 2008).  The Court is not authorized to make independent factual findings.  *Equitable Life Assurance Soc'y v. Sublett* (*In re Sublett*), 895 F.2d 1381, 1384 (11th Cir. 1990).  Legal conclusions by the bankruptcy court, however, are reviewed de novo. *See Club Assocs. v. Consol. Capital Realty Investors* (*In re Club Assocs.*), 951 F.2d 1223, 1228 (11th Cir. 1992).

FACTUAL BACKGROUND

The bankruptcy court made the following factual findings, which this Court finds are not clearly erroneous.

**I.   The Bankruptcy Court's Factual Findings**

A.   <u>Background</u>

Since 1986, Debtor has been a real estate agent associated with Coldwell Banker, Kennon, Parker, Duncan and Key Realtors ("Kennon Parker") as an independent contractor.  (Bankr. Tr. 117-18, Feb. 12, 2009 ("2/12 Tr.");[1] Bankr. Ct. Order Entering J. for Debtor 4, May 13, 2009 ("Op.").)  In addition, for the past ten years, Debtor has

---

[1]The bankruptcy court held a trial on February 11, February 12, and March 31, 2009.  There is a separate transcript for each day of the trial. The Court cites these transcripts as "M/DD Tr."

worked with a team of other real estate agents, assistants, and secretaries marketed under the name "The Larry Mitchell Team." (Op. at 4.) During the course of his career, Debtor has been successful as a real estate agent, typically earning gross commissions of more than $150,000 annually. (*Id. See also* 2/11 Tr. at 197.)

Because Debtor is an independent contractor, Kennon Parker does not withhold payroll taxes from Debtor's commission checks. (2/11 Tr. at 197-98.) Debtor testified that he understood he was responsible for submitting his own income taxes to the Internal Revenue Service ("IRS"). (2/12 Tr. at 118-19.) Until April 1, 2007, Debtor operated as a sole proprietor and paid the salaries of the non-real estate agent employees, overhead, and expenses associated with the Larry Mitchell Team. (Op. at 4.)

Until 1998, Debtor filed timely tax returns. (*Id.* at 4; 2/12 Tr. at 119-20.) Although he occasionally fell behind in his payments—resulting in levy threats and repayment plans—he did pay all income taxes he owed prior to 1998. (2/11 Tr. at 216-17; 2/12 Tr. at 120-21; Op. at 4.) As discussed in more detail below, this case involves back taxes owed to the IRS. The only money the Government collected from the taxes at issue in this case was approximately $7,000 from three sources: an offset of Debtor's 2004 tax refund, a levy on his commissions, and payments he made under an installment agreement. (Op. at 4.)

3

B.    1997 to 2002: Events Surrounding the Tax Delinquency

From 1998 to 2002, Debtor failed to file tax returns or to make estimated tax payments. (*Id.*) However, he did timely request and obtain extensions to file his 1998 and 1999 returns. (Gov't Ex. 10,[2] Certificate of Assessments & Payments at LMUSA 0594, LMUSA 0599.) Debtor testified he did not pay his taxes because his living expenses, business expenses, and divorce expenses fully exhausted his income. (2/12 Tr. 125, 153-55, 165-68, 174-75.)

In 1997, Debtor's marriage to Melanie Mitchell, with whom he had two daughters, began to fail. (*Id.* at 124; Op. at 5.) After a period of separation, Melanie initiated divorce proceedings in 1998. (2/12 Tr. at 124; Op. at 5.) Pursuant to temporary orders issued in the divorce suit, Debtor maintained a separate household for himself, provided $3,000 per month in support payments for Melanie and the children, and paid the mortgage on the house in which they lived. (2/12 Tr. at 125-26; Op. at 5.) In addition, Debtor was paying all the expenses on a number of investment properties he owned but was barred from selling by the divorce court. (2/12 Tr. at 128-29.)

About the time of the divorce, Debtor began suffering from multiple health problems—including depression, heart problems, colon problems, and hyperventilation—some of which required hospitalization. (*Id.* at 125-26.) Debtor testified that the

---

[2]The various exhibits admitted during the bankruptcy court trial are cited as [Party] Ex. #.

expenses and stress of the divorce and the debilitating effects of the medical problems interfered with his ability to work full time and contributed to his increasing financial distress. (*Id.* at 124-26.)

Debtor filed a Chapter 13 petition in January 1999 to stop foreclosure on the investment properties. (*Id.* at 131; Gov't Ex. 51, 1999 Bankr. Pet.) No plan was confirmed, and the case was dismissed. (2/12 Tr. at 139.)

In November 1999, the superior court entered a final decree in Debtor's divorce proceeding, requiring Debtor to pay monthly alimony of $2,764.20 and monthly child support of $937.50. (Pl.'s Ex. 1, Final J. & Decree 4, 7, Nov. 2, 1999 ("Divorce Decree").) The decree also required him to provide copies of his tax returns to Melanie and to pay her six percent of his annual adjusted gross income over $75,000, which was to be calculated without making any deduction for support payments. (*Id.* at 4; *see also* 2/12 Tr. at 140.) In addition, the decree required Debtor to pay Melanie a lump sum of $10,000, to pay her attorney's fees of $22,134.50, and to give her seven of the eight investment/retirement accounts he owned. (Divorce Decree at 7, 15-16.)

One month later, in December 1999, Debtor married his current wife, Kathleen Mitchell, who had two children. (2/12 Tr. at 60; Op. at 5-6.) At the time of the marriage, one of Debtor's children and both of Kathleen's children lived with them in a house they rented

for $1,200 per month.  (2/12 Tr. at 90-92; Op. at 6.)   In 2000, Debtor and Kathleen had a child together, so that four children were living in the household.  (2/12 Tr. at 91-92.)  For approximately the first five years of their marriage, Kathleen earned no money from work outside the home and relied on Debtor for financial support, although she did receive about $300 per month in child support from an ex-husband.  (2/11 Tr. at 102-03, 106-07.)

In 2000 and 2001, Debtor sold most of the investment properties. Debtor realized no financial benefit from the sales.  (Op. at 6.)

In June 2002, Kathleen purchased a house on Pintail Drive for the family.  (2/12 Tr. at 4.)  Debtor testified that it was titled solely in Kathleen's name because Debtor had poor credit and because Debtor did not want to jeopardize the house with his tax problems. (*Id.* at 169.)   Kathleen obtained 100% financing for the $200,000 purchase price from the owner, who knew Kathleen was not working at the time and knew Debtor would be making the payments.  (*Id.* at 5-6, 92.)  Debtor paid the monthly mortgage of approximately $1,537 from his commissions, as well as the insurance and utility bills.  (Op. at 6; 2/12 Tr. at 60-61, 169-70.)

Also in 2002, Melanie Mitchell filed a contempt motion demanding copies of Debtor's tax returns to determine the six percent of his income over $75,000 she was entitled to under the divorce decree. (Pl.'s Ex. 2, Citation for Contempt; 2/12 Tr. at 140-42.)   She requested payments for all three years since the divorce (1999, 2000,

and 2001) at one time, which amounted to approximately $4,000 to $5,000 for each year, for a total of $15,000. (2/12 Tr. at 141-42; Op. at 6.) Debtor testified he had previously fallen behind in his support payments several times and, consequently, had been threatened with incarceration on at least one occasion if he did not bring the payments current. (2/12 Tr. at 174, 177-78.)

About this time, Debtor engaged an accountant, Richard Greenwald, to prepare his delinquent tax returns. (Op. at 7.) Mr. Greenwald suggested that Debtor contact an attorney because tax delinquencies often raise legal issues. (2/11 Tr. at 168.) It is unclear whether Debtor hired Mr. Greenwald directly in response to Melanie's motion for contempt. Debtor testified that he hired the accountant because he wanted closure on his tax problems and wanted to try to work out something with the IRS. (2/12 Tr. at 142.) Based on testimony of Mr. Greenwald, Debtor paid him by a check dated July 16, 2002. (2/11 Tr. at 162.) There is no evidence as to when Melanie filed her motion for contempt, although a hearing on the motion was held in September 2002. (Pl.'s Ex. 2, Citation for Contempt; 2/12 Tr. at 142.)

At the September 2002 hearing, Debtor produced complete copies of his 1999, 2000, and 2001 tax returns, but he did not file them with the IRS at that time.[3] (Pl.'s Ex. 2, Citation for Contempt; 2/11

---

[3]Debtor's 2002 tax returns, which also are at issue in this case, were not yet due when he provided tax returns to Melanie pursuant to her contempt motion.

Tr. at 164-65; 2/12 Tr. at 142-46.)  Instead, he did not file the returns for all the years at issue in this case until June 2003. (2/11 Tr. at 164; 2/12 Tr. at 143.)  Based on his tax returns, Debtor's gross income (after business expenses but before alimony and child support) for the relevant years was as follows:

    1998 – $177,750 (Gov't Ex. 1, 1040 Tax Return for 1998)

    1999 – $135,085 (Gov't Ex. 2, 1040 Tax Return for 1999)

    2000 – $130,813 (Gov't Ex. 3, 1040 Tax Return for 2000)

    2001 – $176,128 (Gov't Ex. 4, 1040 Tax Return for 2001)

    2002 – $176,307 (Gov't Ex. 5, 1040 Tax Return for 2002)

Debtor testified that he did not file returns or otherwise contact the IRS during those years because he did not have the money to pay the full amount of his past due taxes, which he estimated at approximately $300,000 plus interest and penalties.  (2/12 Tr. at 166-68.)  Debtor further testified that he was afraid any contact with the IRS would result in the agency attempting to collect the full amount owed at once.  (*Id.* at 167-68.)  Once his business began improving to the extent he believed he had the resources to deal with his tax debt, Debtor took steps to approach the IRS on his own initiative.  (*Id.* at 166-67.)

C.   2003 to 2007: Efforts to Resolve the Delinquency

In 2003, Debtor contacted attorney Bradley Coppedge to assist him with efforts to compromise his tax delinquency. (*See* 2/11 Tr. at 168.) It was Debtor's understanding that once he submitted an offer in compromise, the IRS was required by its internal rules to halt collection efforts. (2/12 Tr. at 181-82.) However, Debtor also testified that he did not begin the offer in compromise process with the intent to delay paying the past due taxes until they became eligible for discharge in bankruptcy. (*Id.* at 182.) Instead, Debtor testified that he contacted the attorney because he wanted to resolve the tax problems so he and Kathleen could move forward with their lives. (*Id.* at 142.)

Debtor filed the delinquent tax returns for 1998 to 2002 in June 2003. (*Id.* at 143.) At that time, the 2002 returns were two months late. In September 2003, Debtor submitted an offer in compromise for $25,000 to the IRS. (Op. at 8.) Debtor relied on the advice of Mr. Coppedge in selecting an amount to offer. (2/12 Tr. at 170-71.) The offer was returned due to certain deficiencies in employment tax returns. (Op. at 8.) The IRS subsequently filed two notices of federal tax liens in January 2004. (Gov't Ex. 13, Notices of Fed. Tax Lien Filing, Jan. 30, 2004.)

Debtor resolved the problems related to his first offer in compromise and submitted a second offer for $25,000. (Gov't Ex. 19.) Initially, after receiving the offer, the IRS did not consider it

because the agency erroneously determined Debtor was subject to an ongoing audit.  (Op. at 8.)   After discovering its mistake, the IRS returned the offer without considering it because Debtor had made no estimated tax payments for 2003.  (*Id.*  *See also* Gov't Ex. 19.)

In April 2004, after being threatened with a levy by the IRS, Debtor submitted a third offer in compromise for $35,000.  (2/11 Tr. at 45.)   Also, about this time, Debtor hired a new accountant, Richard Malott.  (*Id.* at 221.)   In June 2005—more than a year after receiving the third offer—the IRS returned it because Debtor had fallen behind in his 2004 estimated tax payments.  (Op. at 9.)   The delay in returning the offer was caused by mistakes made by the IRS regarding Debtor's tax compliance.  (*Id.*)   When the IRS returned the third offer, it informed Debtor that it had determined—based on internal standards for calculating his income and allowable expenses—that he could pay his past due taxes in full.  (Gov't Ex. 21-J.)   The IRS also told Debtor that he could not submit another offer in compromise for six months.  (Gov't Ex. 12, IRS Archive Tr. at 35.)

In early to mid 2005, while the third offer was still pending, Debtor and Kathleen decided to build a new, larger house on Leafbrook Drive and agreed to pay $465,000 for its construction.  (2/12 Tr. at 184-88.)   Debtor and Kathleen testified they had several reasons for building the house.  (*Id.* at 49, 184-88.)   At that time, Debtor's younger daughter had come to live with them, and they believed they

needed more room. (*Id.*) In addition, based on advice from their attorney and accountant, they thought their tax issues would soon be resolved through an offer in compromise. (*Id.*) The housing market was booming, and they expected the house to serve as an investment that would appreciate in value, which was of particular concern to Debtor because he had no retirement savings. (*Id.*)

On June 20, 2005, the IRS issued a notice of levy against all of Debtor's assets and income. (Op. at 10.) About this time, Mr. Malott advised Debtor that he needed to remain current on his estimated withholding tax payments. (2/11 Tr. at 241-43.) He suggested Debtor form a corporation and work as an employee of the business. (2/12 Tr. at 70-71.) The business would receive Debtor's commissions, pay him a salary, and withhold payroll taxes, which would keep Debtor current with the IRS going forward. (*Id.* at 70.) For those reasons, Debtor formed MI Real Estate Network, Inc. in August 2005. (*Id.*) It did not begin operations at that time. (2/11 Tr. at 243.) Mr. Malott testified that Kathleen was made the sole officer, director, and shareholder of the company because they did not think it would be a good idea to have someone with Debtor's tax problems heading it. (*Id.* at 235.)

In December 2005, Debtor and Kathleen sold the Pintail house, realizing a profit of approximately $56,000. (2/12 Tr. at 34, 37.) Kathleen deposited the proceeds into a bank account she had opened when she had started working as a Mary Kay beauty consultant in 2004.

(*Id.* at 35-37.)   Kathleen used $46,000 of the proceeds as a down payment on the new Leafbrook house.  (*Id.* at 37.)   Kathleen obtained a loan for the Leafbrook house and titled the house solely in her name.  (*Id.* at 43, 46.)   She testified that she obtained the loan because, unlike Debtor, she still had good credit, which was necessary even for a "no doc" loan.  (*Id.* at 51.)

The Leafbrook house was subject to two mortgages, initially requiring monthly payments of $2,762 and $546.  (*Id.* at 44-45.) After Kathleen refinanced several times, the total mortgage payment was approximately $3,500 per month.  (*Id.* at 58; Op. at 10.)   As with the prior house, Debtor made all the mortgage payments, insurance payments, and utility payments.  (2/11 Tr. at 109-10.)

In February 2006, the IRS issued a levy on Debtor's income from Kennon Parker and a levy on Debtor's personal bank account.  (2/12 Tr. at 190.)   After consulting with legal counsel, Kennon Parker determined the levy was a one-time levy, rather than a continuing levy, and made one payment to the IRS on February 8, 2006.  (2/11 Tr. at 202-04.)   About this time, Debtor closed his personal bank account and began depositing his commission checks in the MI Real Estate account and Kathleen's Mary Kay account.  (2/12 Tr. at 39-42, 191-92.)

On February 16, 2006, Debtor proposed an installment agreement to pay his past due taxes.  (2/11 Tr. at 226-27.)   A pending installment agreement stops any other collection activity by the IRS.

(*Id.* at 224.)   Unlike an offer in compromise, an installment agreement requires full repayment of the taxes.   (*Id.* at 226.) Debtor proposed to make timely estimated tax payments and to pay nine percent—eventually increasing to twelve percent—of his gross revenues to the IRS.   (Gov't Ex. 12, IRS Archive Tr. at 58.)

MI Real Estate began operations in April 2006.   (2/11 Tr. at 149, 243; Op. at 11.)   There was a delay between formation of the corporation and beginning operations because Debtor had to take steps to comply with certain state laws to allow his real estate commissions to be paid to a corporation.[4]   (2/11 Tr. at 223.) Debtor's commissions from Kennon Parker were paid to MI Real Estate, which in turn paid Debtor as a salaried employee.   The corporation withheld Debtor's employment taxes, which eliminated the need to make estimated tax payments.   (2/11 Tr. at 224, 243.)   Kathleen also is paid a salary by MI Real Estate.   (2/12 Tr. at 77; *see generally* Gov't Exs. 36-37, MI Real Estate W-2s and tax returns.)   Their salaries were determined, in consultation with Mr. Malott, based on the amount of money they needed to pay their expenses.   (2/11 Tr. at 234.)

According to tax records, in 2006 MI Real Estate's gross receipts totaled $251,000, which came solely from Debtor's

---

[4]Although Debtor was in compliance with the law when MI Real Estate began operating, the law changed a few months later in July 2006 so that any real estate agent whose commissions are paid to a corporation must be at least a 20% shareholder in the corporation.  (Op. at 11 n.3.)  Debtor apparently made no effort to comply with the new law although he represented to Kennon Parker that he was in compliance.  (*Id.*)

commissions.  (2/12 Tr. at 78.)  That year the company paid Debtor $78,625 and paid Kathleen $26,000.  (*Id.* at 77; Gov't Ex. 36, MI Real Estate W-2s.)  The corporation also paid all the expenses of the Larry Mitchell Team, which previously had been paid by Debtor.  (2/12 Tr. at 76.)

In June 2006, the IRS accepted Debtor's proposed installment agreement.  (Gov't Ex. 12, IRS Archive Tr. at 56, 58.)  In July and August 2006, Debtor made payments under the installment agreement. (2/11 Tr. at 233; 2/12 Tr. at 195.)  On August 29, 2006, Debtor filed his bankruptcy petition.  (Op. at 12.)  He testified that he did so because he had fully exhausted his options with the IRS and was unable to pay his expenses after the IRS took nine percent of his income.  (2/12 Tr. at 195-96; *see also id.* at 87; Op. at 12.)

> D.   Late 2006 to Present: Post-Petition Activity

In 2007, Kathleen purchased an investment property with the intent of renovating it and selling it for a profit.  (2/11 Tr. at 209; 2/12 Tr. at 80.)  Dan Parker, a part owner of Kennon Parker, loaned her money at Debtor's request for the purchase price and repairs.  (2/11 Tr. at 209.)  She did not have to make monthly payments, but she was required to repay the loan with interest at maturity.  (*Id.* at 210.)  When she sold the house, Kathleen repaid the loan in full, but made little or no profit.  (*Id.* at 210-11; 2/12 Tr. at 80-81.)

In May 2007, Kathleen received her real estate license and began having her commission checks paid to MI Real Estate. (2/12 Tr. at 72-73, 100.)

In late 2007, Debtor and Kathleen put the Leafbrook house on the market. (*Id.* at 46.) As of the time of the bankruptcy court trial, it remained unsold, although they had reduced the asking price from $499,000 to $479,000. (*Id.*)

E.   Discretionary Expenses

1.   *Divorce Related Expenses*

In late 1998 and 1999, during his separation from his first wife Melanie, Debtor was unable to maintain payments on Melanie's house, as required by court order. (*Id.* at 178-79.) Jack Rogers, a co-signer on the mortgage, made the payments. (*Id.*) After the divorce, Debtor sold the house at a loss and repaid Mr. Rogers with ten percent of his commissions over two years for a total of approximately $30,000. (*Id.* at 179-80.)

2.   *Investments*

In 1999, Debtor purchased stock in Compaq and Intel. (*Id.* at 156.) He testified that he did so because he had no assets left after the divorce and was trying to rebuild. (*Id.*) Technology stocks were doing well at the time, and he believed it was a good investment. (*Id.*) In addition, from January 2002 to August 2006, Debtor contributed $100 per month to an investment account. (*Id.* at 201-02.) He testified that he intended to use the money for his

15

retirement.  (*Id.* at 202.)  There is no evidence Debtor attempted to conceal his ownership of these accounts or otherwise place them beyond the reach of the IRS.  (Op. at 13.)

### 3.  Vacations

From 2002 to 2005, Debtor and Kathleen financed the purchase of three vacation timeshares.  (2/12 Tr. at 69, 78-80, 172-73.)  A timeshare in Destin, Florida, that had cost approximately $1,500 down and $250 per month, had been foreclosed upon in the bankruptcy.  (*Id.* at 78-80; Gov't Ex. 33.)  They also purchased a timeshare in Orlando, Florida, for $1,754 down and $200 per month (Gov't Ex. 32; 2/12 Tr. at 68-69) and a timeshare with various destinations that cost $650 down and $100 per month (Op. at 13; 2/12 Tr. at 172-73).  Debtor testified that the timeshares were the most affordable way for him to provide a vacation for his family.  (2/12 Tr. at 172.)

### 4.  Vehicles

In 2003, Kathleen purchased a used Jaguar sedan for approximately $19,000.  (*Id.* at 61-63.)  Debtor supplied a down payment of $2,000, which covered the taxes and other fees.  (*Id.* at 62.)  Kathleen financed the purchase price, and the car was titled in her name.  (*Id.* at 61-62.)  However, Debtor made the monthly payments of $407.  (*Id.* at 62.)  The car was purchased to replace an old minivan to enable Kathleen to take the children to and from school.[5]

---

[5]At that time, Debtor had a spare vehicle—a GMC Trailblazer.  (2/12 Tr. at 65-67.)  However, it was not available for Kathleen to use because Debtor had loaned it to his older daughter, who was recently divorced and

(*Id.* at 62-63.)  Also in March 2003, Kathleen purchased a Mitsubishi Lancer for her daughter, Brittany.  (*Id.* at 25-26.)  The loan and title were in Kathleen's name, but Debtor made the monthly payments of $347 and paid for insurance.  (*Id.* at 25-27, 183.)  In 2005, Debtor purchased a 2000 Pontiac Grand Am for $5,000 for his younger daughter Lindsay.  (*Id.* at 67-68, 201.)  In 2008, Debtor purchased a Nissan Pathfinder with cash after his vehicle, a Ford Expedition, was repossessed.  (*Id.* at 81-82.)  He testified that he paid cash because he was unable to obtain financing.  Debtor also leased a GMC Trailblazer that he surrendered in the bankruptcy case.  (*Id.* at 66.)

### 5.  *Utilities*

Debtor paid $126 per month for cable from 1999 to 2005.  (*Id.* at 31-32.)  From 2003 to the present, Debtor has paid for three cell phones—one for himself, one for Kathleen, and one for Brittany.  (*Id.* at 32-33.)

### 6.  *Educational Expenses*

From 1999 to 2006, Debtor made monthly payments of approximately $211 on a student loan incurred by Kathleen prior to their marriage. (*Id.* at 23-24.)  The loan currently is in deferment.  (2/11 Tr. at 101.)  Debtor paid college tuition and book costs of approximately $15,000 for Brittany at Columbus State University from 2005 to 2008. (2/12 Tr. at 183; Op. at 14.)  During that time, Brittany lived at

---

had no other means of transportation.  (*Id.*)  She was not a minor, and Debtor had no legal support obligations to her.  (Op. at 14 n.4.)

home and worked part time to pay for her own clothes, meals away from home, and other incidental expenses.  (2/12 Tr. at 183-84.)

### 7.  *Charitable Contributions*

Debtor donated a portion of his income to his church in the following amounts: $351 in 1998, $0 in 1999, $6,310 in 2000, $10,860 in 2001, $13,453 in 2002, $15,700 in 2003, $14,167 in 2004, $11,068 in 2005, and $9,088 in 2006, for a total of about $81,000.  (*Id.* at 162-63; Gov't Exs. 1-9.)  Neither party provided evidence about Debtor's contribution history prior to 1998.  (Op. at 15.)

### 8.  *Child Care*

Beginning in 2002 until late 2003 or early 2004, Debtor paid $500 per month for daycare for his youngest child.  (2/12 Tr. at 8-10.)  During that time, Kathleen was unable to watch the child because she was working at Debtor's office without pay, doing various administrative tasks, such as coordinating advertising and team-building projects.  (*Id.* at 8-13.)

## II.  **Bankruptcy Proceedings**

Debtor filed a Chapter 11 petition on August 29, 2006, which was converted to Chapter 7 on October 3, 2007.  (Op. at 3.)  On the petition date, Debtor owed considerable back taxes to the IRS, including $477,513.44 in personal income taxes, employment taxes, and interest for 1998 to 2002.  (Ex. 6 to Notice of Appeal, IRS Proof of Claim.)  Of that amount, approximately $287,000 is at issue in this case. (*Id.*)

18

On March 19, 2008, Debtor filed an amended complaint to determine the dischargeability of his past due income taxes pursuant to § 523(a)(1)(B). (Adv. Doc. 9.)[6]  In its answer, the Government contended the past due income taxes were nondischargeable under § 523(a)(1)(C). (Adv. Doc. 10.)  The bankruptcy court held a trial in this case on February 11, February 12, and March 31, 2009, during which the parties presented evidence and legal arguments. (Op. at 3.)  On May 13, 2009, the bankruptcy court entered its order finding that Debtor's federal tax liabilities for 1998 through 2002 are not excepted from discharge pursuant to § 523(a)(1)(C) of the U.S. Bankruptcy Code and entered judgment for Debtor. (Adv. Docs. 33, 34.)  The Government appeals that order. (Adv. Doc. 37.)

DISCUSSION

Pursuant to 11 U.S.C. § 727(b), a Chapter 7 debtor is entitled to a discharge of all debts except those listed in § 523(a).  Section 523(a)(1)(C) provides that the discharge does not apply to tax debt "with respect to which the debtor . . . willfully attempted in any manner to evade or defeat such tax."  11 U.S.C. § 523(a)(1)(C). Exceptions to the general rule of discharge, such as § 523(a)(1)(C), are to be strictly construed in favor of the debtor.  *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1394 (11th Cir. 2000) (en banc).  Therefore, the Government has the burden to prove

---

[6]The Court cites documents filed in the bankruptcy court trial as Adv. Doc. #.

nondischargeability of a tax debt by a preponderance of the evidence. *Id.* at 1396.

Section 523(a)(1)(c) contains both a conduct and a mental state requirement.  *United States v. Fretz* (*In re Fretz*), 244 F.3d 1323, 1327 (11th Cir. 2001); *see also United States v. Jacobs* (*In re Jacobs*), 490 F.3d 913, 921 (11th Cir. 2007).  The conduct requirement is that the debtor "attempted in any manner to evade or defeat [a] tax," while the mental state requirement is that this attempt was done "willfully."  *Fretz*, 244 F.3d at 1327.

## I.   The Conduct Requirement

The conduct requirement may consist of affirmative acts or omissions "'to avoid payment or collection of taxes.'"  *Jacobs*, 490 F.3d at 921 (quoting *Gardner v. United States* (*In re Gardner*), 360 F.3d 551, 558 (6th Cir. 2004)).  Mere nonpayment of taxes is not sufficient to satisfy the conduct requirement. *Griffith*, 206 F.3d at 1395.  However, nonpayment in conjunction with failure to file returns can constitute evasive conduct.  *See Fretz*, 244 F.3d at 1329-30.

Debtor's failure to pay his tax obligations, coupled with his failure to file tax returns from 1998 through 2002, satisfies § 523(a)(1)(C)'s conduct requirement.  *See Fretz*, 244 F.3d at 1329. The bankruptcy court did not clearly err in finding that nothing in the evidence mitigates this conduct.  Thus, the bankruptcy court's finding that the IRS carried its burden of establishing the conduct element is affirmed.

## II.  The Mental State Requirement

Whether Debtor satisfied § 523(a)(1)(C)'s mental state requirement by "willfully" engaging in the conduct is a closer call, one that this Court finds the bankruptcy court could have resolved either way.  To satisfy § 523(a)(1)(C)'s mental state element—willfulness—the government must show the debtor acted "voluntarily, consciously or knowingly, and intentionally." *Fretz*, 244 F.3d at 1330.  "Fraudulent intent is not required." *Id.*  Thus, the Government can prove willfulness by showing Debtor: (1) had a duty to pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty. *Id.*

Given that Debtor admitted that (1) he had a duty to pay income taxes and (2) he knew of the duty, this case turns on the third component—whether Debtor voluntarily and intentionally violated his duty to pay income taxes.  The willfulness component of the mental state requirement "'prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate.'" *Fretz*, 244 F.3d at 1330 (quoting *In re Birkenstock*, 87 F.3d 947, 952 (7th Cir. 1996)).

In determining whether a debtor was willful, courts consider direct evidence of willfulness, and circumstantial evidence of willfulness, including certain "badges of fraud" and the discretionary expenditures incurred by a taxpayer. *See Jacobs*, 490

21

F.3d at 926; *Fretz*, 244 F.3d at 1331; *Griffith*, 206 F.3d at 1396. Here, since no direct evidence was presented on this issue, the bankruptcy court evaluated the circumstantial evidence of Debtor's intent. "Having considered the badges of fraud, Debtor's discretionary expenses, and the various forces impacting Debtor's financial situation, [the bankruptcy court found] insufficient evidence to support a conclusion of willfulness." (Op. at 27.)

"[T]he bankruptcy court's determination whether a debtor willfully attempted to evade or defeat a tax is a question of fact reviewed for clear error." *Zimmerman v. IRS* (*In re Zimmerman*), 262 F. App'x. 943, 946 (11th Cir. 2008) (per curiam) (citing *Jacobs*, 490 F.3d at 921). The bankruptcy judge who presided over the case saw the witnesses and heard their testimony. He is in the best position to evaluate whether the Government carried its burden of proving the requisite intent. *In re Sheridan*, 57 F.3d 627, 634 (7th Cir. 1995); *see also* Fed. R. Bankr. P. 8013 ("[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

This Court on appeal is not authorized to second-guess the factual findings of the bankruptcy court unless they are clearly erroneous. Having thoroughly reviewed the record, this Court finds that sufficient evidence exists from which the bankruptcy judge could have concluded that the Government failed to carry its burden of

proving that Debtor willfully attempted to evade his taxes. Accordingly, this finding is not clearly erroneous.

CONCLUSION

The bankruptcy court did not clearly err in finding that Debtor did not willfully evade his income taxes.  The bankruptcy court's order is therefore affirmed.


IT IS SO ORDERED, this 9th day of December, 2009.


                                    S/Clay D. Land
                                        CLAY D. LAND
                                    UNITED STATES DISTRICT JUDGE